**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  24-80103-CR-CANNON**

**UNITED STATES OF AMERICA**

**v.**

**DUSTIN SEAN MCCABE,**

    **Defendant.**

_____/

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR ACQUITTAL**

The United States of America, through the undersigned Assistant United States Attorney, respectfully submits this Opposition to the Defendant's Motion for Acquittal, DE 95 ("Motion"):

This Court should deny the Motion because all four of challenges are meritless. The Defendant first asks for acquittal based on this Court denying his severance request, Mot. at 2, but severance is not relevant to sufficiency, and this Court correctly decided the issue anyway. The defense next raises the so-called "spoilage of key evidence" and "the unavailability of the vessel," Mot. at 2, but this is not only nonsense as a matter of fact but also again is an improper basis for challenging sufficiency because no specific vessel evidence was needed to prove the manslaughter charge here. The defense's third basis for relief is this Court excluding the victim's positive drug test, Mot. at 2, but the Defendant cannot challenge that ruling due to his stipulating to the evidence's exclusion—grounds for invited error even were the Court to have erred (it didn't). The Defendant finally claims that there wasn't enough evidence presented for a jury to have found him guilty of wire fraud, Mot. at 2, but (as with all other charges) the Government's case-in-chief and the Defendant's preposterous testimony were more than enough to convict. The sum of all this is a Motion that doesn't have a leg to stand on and that this Court should deny without a hearing.

## I.    RELEVANT FACTS

The following facts were adduced from the testimony of 26 witnesses (25 for the Government and the Defendant himself) during a seven-day trial lasting from February 24 through March 4, 2024. This testimony resulted in the jury returning a guilty verdict as to all counts:

### A.  **Government's Case**

The Government's case began by presenting evidence about what occurred on the M/V Southern Comfort (the "Vessel") the day before the Defendant killed M.C.G.F. The first and most consequential Government witness that the jury heard from was Jennifer Hester, an experienced diver who regularly dove with the Defendant and who showed that the Defendant knew the Vessel to have serious mechanical issues on March 28, 2020.  Specifically, Ms. Hester told the jury about three significant occurrences that prior day that put the Defendant on notice about the Vessel. First, she testified about her nearly being sucked into the Vessel's propeller, saved only by her spear gun discharging. Second, Ms. Hester told the jury that she saw the propeller that nearly injured her engaging on and off when the Vessel was supposed to be in neutral during the day's second dive and told the Defendant that same day, as evidence by a Facebook message admitted as GX 11. Third, Ms. Hester told the jury about the about the Defendant's vessel's grounding and loss of maneuverability on March 28, 2020, the date before the death of M.C.G.F. This third piece of her testimony, regarding the Vessel's running aground on March 28, 2020, was corroborated by testimony from Jordan McKenna, Officer Michael Abramczyk, Carl McManus (who also noted the Vessel's serious mechanical issues that day), and Captain Kimberly Odom.

Before reaching the day of M.C.G.F.'s death, the Government also called Steve Poznak, who testified to facts supporting all five charges in the Indictment. Mr. Poznak first explained that he had gone diving with the Defendant for several years prior to March 2020 and had discussed a

plan with the Defendant to purchase a vessel and run a "boutique" or "concierge" charter business. That plan resulted in the two purchasing the Vessel, with Mr. Poznak co-signing on the vessel's mortgage. Through all this, Mr. Poznak was crystal clear that the purpose of the Vessel's purchase was always to operate commercial scuba charters. Beyond that, Mr. Poznak also stated that he spoke with the Defendant regarding the incident that occurred with Ms. Hester, and warned the Defendant, telling the Defendant that he got lucky that the incident was not more severe. Lastly, Mr. Poznak testified to three things that happened after M.C.G.F.'s death: (1) that he was not aware of the Defendant ever taking out charters again, (2) that the Defendant discussed taking out a Paycheck Protection Program ("PPP") loan, and (3) that when Mr. Poznak repossessed the Vessel, he found that the Vessel's engine room was flooded.

The Government next moved to the day of M.C.G.F.'s death, starting with her husband Sean Flynn. Mr. Flynn told the jury about the tragic events of March 29, 2020: that the Defendant failed to warn Mr. Flynn and his wife about the serious mechanical issues that occurred on the prior day and that he was with his wife when she was sucked into the Vessel's propeller. Here Mr. Flynn described a scene that left the courtroom in tears and silence, with M.C.G.F. and him desperately trying to free her but it being impossible to do so in time because her leg was essentially wrapped around the Vessel's shaft. He told the jury how the death of M.C.G.F. has impacted his life, and how is not the same person that he was before this incident.

Two other eyewitnesses from the Vessel that day bore out this testimony. David Anderson, another diver onboard that day, told the jury that the Defendant made a point to tell the passengers that he was not required to provide a safety brief to them because his new vessel was not inspected by the Coast Guard. Mr. Anderson also recounted that he was on the vessel as it continued to move backward, over the victim, and that he overheard the Defendant say he had "just killed

somebody." The other witness, Captain Kimberly Odom, was one of the vessel's deckhands, and she provided several significant pieces of testimony about M.C.G.F.'s death and about the Defendant's scuba charter business more generally. Captain Odom first explained that the Defendant had modified the vessel for the purposes of making it a dive charter and that while she worked on the Defendant's vessel, she was never an employee, and that he did not have employees or payroll.  She testified that she and the other deckhands would work for the tips and the experience. She also told the jury about the moments surrounding the tragic death of M.C.G.F., including that she saw the water red with blood.

After M.C.G.F.'s death came the ensuing investigation. On this front, Investigator Jason Willems and Investigator David Fowler from the Florida Fish and Wildlife Conservation Commission ("FWC") and Christopher Mosquera and Sean Goodman from the United States Coast Guard ("USCG") testified about arriving on scene and about the days surrounding the events.

On the FWC front, Investigator Willems testified about his inspection of the Vessel's propellers and hull area shortly after the incident, testifying about how he dove under the vessel and saw tell-tale signs—a dent in the propeller and scratches on the hull that were fresh enough for no algae to have bloomed on top of them—that the propeller was activated when it hit the victim. He also stated that based on his experience, a propeller cannot cause serious injuries unless it is engaged. Investigator Fowler then testified that he was one of the first investigators on scene when the Vessel arrived at the marina, on March 29. Investigator Fowler testified about his investigation of the incident, explaining that he did not suspect that a mechanical issue could have caused the incident because he was unaware of the mechanical issues and grounding that had occurred on the previous day.  Investigator Fowler also testified that the Defendant informed him

that he was living on the vessel at the time because the Defendant was getting divorced, so that was taken into consideration when the vessel was not seized at the time.

The USCG witnesses then further explained the investigation here. Inspector Goodman explained that he, like the FWC witnesses, was on scene when the Vessel first arrived back at the marina. He explained that he was on duty for the Coast Guard Marine Safety Detachment Lake worth on March 28, 2020, and March 29, 2020. In that capacity he would have been notified of any marine casualties that needed to be reported to the Coast Guard including groundings and propulsion or steering irregularities. However, he testified that no such incidents were reported to him on March 28, 2020. Mr. Goodman also explained the Coast Guard form 2692 (GX 81), which lists the types of casualties that must be reported to the Coast Guard. Mr. Goodman also told the jury about a text message that the Defendant sent him, telling Mr. Goodman that the business was shut down in the wake of the death of M.C.G.F. The Government also introduced a screenshot of this message between Mr. Goodman and the Defendant (GX 82). Mr. Mosquera, who was Inspector Goodman's supervisor, corroborated Inspector Goodman's testimony and explained that the situation would have been handled differently had he been aware of the grounding and mechanical issues—specifically, that if the Coast Guard had been aware of the issues on the previous day, his office could have taken action on the vessel.

After these fact experts came a series of experts. The first was Paul Alber, an expert on Global Positioning Systems (GPS). Mr. Alber testified that on the day of the death of M.C.G.F., he arrived on scene with the vessel and copied the information from the vessel's GPS. Using that GPS data, he created a report that he showed to the jury. The report illustrated the track of the Defendant's vessel as it left the port, went around some diving spots, and ultimately returned to the dock. The report corroborated the statements made by the passengers of the vessel, and gave a

more specific location on where the death likely occurred.

The next two experts were USCG members. Lieutenant Commander ("LCDR") Andrew Cole from the Coast Guard testified about general dive safety, along with requirements for the reporting of marine casualties, and the requirements for uninspected passenger vessels. LCDR Cole was qualified as an expert, related to his experience as a Coast Guard Inspector and Investigator, and his experience as a commercial dive master. He testified that dive safety briefs are a standard practice.  LCDR Cole told the jury that Coast Guard regulations are written in blood, meaning that the reason the Coast Guard has regulations, like the marine casualty reporting regulations, is so that accidents can be prevented before they ever happen.  He also talked about the regulations themselves, including providing testimony that small passengers have additional safety regulations that do not apply to recreational vessels, and the differences between a recreational and a coastwise, or commercial vessel.  LCDR Cole also testified that the captain of a vessel has a duty to keep the passengers and crew safe.

The other USCG expert was Allan Roth, an expert on vessel mechanics and USCG Regulations.  Mr. Roth told the jury that he spent approximately 30 years working for the USCG as a vessel mechanic and vessel inspector.  Mr. Roth reviewed a survey report from when the vessel was sold to the Defendant, along with a report that detailed the investigation of the incident, and some pictures. Mr. Roth told the jury that based on his training and experience, modifying the vessel's cable system could cause serious issues with the vessel's propulsion system, that would require recalibration. This included if the throttles were removed from the lower control station. He also testified that this type of modification could cause the vessel's propellers to activate while the vessel was in neutral, and that the propellers would not be moving fast enough to bend a spear or cause the victim's injuries, if they had not been engaged.  Mr. Roth also made the same point

as LCDR Cole, about how Coast Guard regulations are written in blood, meaning that the regulations are in place to prevent marine casualties or accidents.

The final expert was the medical examiner, Dr. Terrill Topps. Dr. Topps testified that M.C.G.F. died by drowning and that the chop wounds on her were a contributing factor to her death. During his testimony, he went through several pictures of the body of M.C.G.F. and showed the signs that he looked for to support this conclusion.

After these witnesses came more who testified about the Defendant's scuba business and PPP loans. Captain Christopher Cederholm, the Coast Guard Captain of the Port for Sector Miami told the jury about the role of the Captain of the Port, and how he has a responsibility to keep the waterways safe. He explained that Coast Guard Sector Miami is responsible for waterways from south of Miami to past Fort Pierce in the North, including the Palm Beach Area, where this incident occurred. He also explained to the jury what a Captain of the Port Order is, and how the Captain of the Port uses them to ensure the safety of the port.  Notably that a Captain of the Port Order can be used to limit the operations of a vessel and require a vessel to meet certain safety obligations. He also explained the Captain of the Port order that was issued in this case, and how it prevented Florida Scuba Charters from operating the Vessel and that it had never been rescinded (GX 12).

Five more civilian non-government witnesses testified about the Defendant's business as well. Kristy Kelly, the Defendant's ex-wife, also took the stand and testified on behalf of the United States.  She testified that she had previously done the books for the Defendant's business, and that the financial figures that were represented in the PPP application were not consistent with her memory of Florida Scuba Charters' finances.  She also testified that she was not aware of a business tax return, and that Florida Scuba Charters never had any payroll or employees, besides herself and the Defendant, and that she had been removed from the company prior to the incident.

Furthermore, Ms. Kelly testified that she was removed from all of the bank accounts for Florida Scuba Charters, in the months leading up to the death of M.C.G.F.

Captain Sandra Brammier testified that she had known the Defendant for several years prior to the death of M.C.G.F., and they had a good working relationship. She was the captain of another dive vessel that had a very similar operation to that of the Defendant. The testimony of Captain Brammier related to all of the charges against the Defendant. Most notably, she told the jury that she arrived to the marina where the Southern Comfort was tied up, in the hours after the incident. Amongst other things, Captain Brammier told the jury that she specifically directed the Defendant to ask the Coast Guard for their engineer to take a look at the vessel's propulsion system, and identify if there was a problem with the vessel or its controls, but she was not aware that he ever did. She also testified that in the months after the incident she stayed in touch with the Defendant, and they discussed applying for the PPP program. She considered an application, but after doing some research determined that she was not eligible. Her testimony about the Defendant filing PPP loans was corroborated by Joshua Steib from the marina they frequented, through whom the Government showed the jury a PPP loan application that the Defendant had Mr. Steib print and then scan for him.

The final two civilian non-government witnesses were Avi Pollack and Justin Masterman from the banks associated with the PPP loans here. Mr. Pollock and Mr. Masterman both discussed how the PPP applications and forgiveness applications were handled at their banks. Mr. Pollock works for Cross River Bank, and Mr. Masterman works at Celtic Bank. Both individuals were shown PPP applications and forgiveness applications that the Defendants made to their bank. Based on these documents, these bank representatives confirmed that these documents were sent to their respective banks as part of the Defendant's PPP loan application, and that their banks relied

on the attestations made on the documents to grant the loans in the first place, and later forgive the loans. They also testified the money from the loans was supposed to be used for payroll, and a few other limited purposes.

The final grouping of witnesses are two government employees and the case agent, who testified about documents relating to the Defendant's false statement to the USCG and his PPP fraud. Andrea Walker from the Coast Guard National Vessel Documentation Center ("NVDC") explained the role of the NVDC, and testified about a variety of documents and that were processed by the NVDC including the USCG Form 1258 (GX77), which is the form that the Defendant lied on by checking two separate boxes that attested the Vessel was going to be used for recreational purposes. Ms. Walker explained that the Coast Guard, through the NVDC, relies on these attestations when issuing a vessel's certificate of documentation which is the vessels registration document.  Ms. Walker also explained that in this context the term "recreational" refers to a vessel used only for pleasure, and not for commercial purposes.  Ms. Walker also testified that a vessel registered in the manner that the Southern Comfort was registered could not take passengers for hire, and that the Certificate of Documentation was not even issued for over a month after the incident, so the Defendant should not have been taking out any passengers at that time.

Althea Harris from the Small Business Administration testified about the PPP program more broadly.  She explained that the purpose of the program was to provide loans for small businesses to support their businesses that were shut down due to the COVID-19 Pandemic.  Ms. Harris explained that these funds could be used for limited purposes, but that the majority of them were required to go to payroll for the company.  She also explained that the intent of these loans was so that business could stay open, and that business that were shut down and not operating would not be eligible for these loans.

The last witness that testified for the Government was Special Agent Caleb King, the case agent assigned to this case. Special Agent King testified about several topics, but his most consequential testimony related to the Defendant's bank records. Special Agent King explained that once the money from the PPP loans was wired to the Defendant's business account, he was then transferring the money to his personal accounts or writing checks to cash.  Special Agent King highlighted a specific instance where, shortly after receiving a wire related to the PPP loan, the Defendant wrote a check to the PGA National Golf Club.  This demonstrated that the money from the loans was going directly to the Defendants golf club membership.

The Defendant also stipulated that the tax documents that were connected to his PPP loan applications that were submitted to Celtic Bank and Cross River Bank, were not tax documents that had been filed with the Internal Revenue Service (IRS).

### B.  Defense Case

As for the defense, the only witness that testified was the Defendant himself.  In his testimony, the Defendant attempted to explain away virtually every single fact the Government proved through testimony that frequently veered into the preposterous. As far as the Vessel's malfunctions were concerned, he made several statements that contradicted what was said by the other witnesses and the evidence on the record. His testimony was wide-ranging, but here the Government notes three particularly egregious examples. First, the Defendant stated that his modifying the Vessel's throttle cables could not have impacted the Vessel's main control system, when the Defendant was impeached on this point based on a statement he made in the hours after the incident where he said his modifications had caused issues. Second, the Defendant testified that the Vessel never ran aground on March 28, and that he only anchored the vessel on the side of the channel.  And finally, the Defendant stood up and went to an easel to explain to the jury

how the ocean current could cause M.C.G.F.'s leg to get wrapped around his propeller shaft. As to the wire fraud counts, the Defendant stated that he had only filed out the forms in the way that he was instructed to do so by the staff at the bank, who he had spoken to at the time, and denied that the tax forms the bank representatives had testified to being part of his applications were actually, in fact, part of his applications.

## II.   LEGAL STANDARD

Two sets of legal principles should guide this Court's analysis. The first is the familiar Rule 29 framework: that "[a] Rule 29 motion is by definition a challenge to the sufficiency of the evidence." *United States v. Torres*, 531 F. App'x 964, 967 n.2 (11th Cir. 2013). To perform that analysis, this Court should "view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *Steiner v. United States*, 940 F.3d 1282, 1288 (11th Cir.), *cert. denied*, 141 S. Ct. 320 (2020) (internal quotations omitted). "The court need not exclude every reasonable hypothesis of innocence or find guilt to be the only reasonable conclusion." *United States v. Garcia*, 13 F.3d 1464, 1473 (11th Cir. 1994). Rather, and while "recognizing that [the Defendant] shoulders a heavy burden in challenging the sufficiency of evidence supporting his convictions," this Court must only find that "the jury was rationally able to find that every element of the charged crimes was established." *United States v. McCarrick*, 294 F.3d 1286, 1290 (11th Cir. 2002). Which is to say, a "jury's verdict cannot be overturned for insufficient evidence unless there is no reasonable construction of the evidence that could support a guilty verdict." *United States v. Smith*, 22 F.4th 1236, 1242 (11th Cir. 2022); *see also, e.g., United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013) (reiterating this standard while reversing a court's post-verdict Rule 29 judgment of acquittal).

The second legal principle at play here involves the Defendant's decision to testify. The Eleventh Circuit has long recognized that a defendant's choice to testify changes things because "a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." *United States v. Brown*, 53 F.3d 312, 316 (11th Cir. 1995). For that reason, the Eleventh Circuit has held that "where some corroborative evidence of guilt exists for the charged offense …. and the defendant takes the stand in his own defense, the defendant's testimony, denying guilt, may establish, by itself, elements of the offense." *Id.* at 314-15. The Eleventh Circuit went on to explain "[t]his rule [to] appl[y] with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge." *Id.* at 315. "Experience tells us that, where the issues in litigation involve highly subjective matters, the appearance and demeanor of the witnesses is of particular significance." *Id.* In *Brown*, for example, the Eleventh Circuit noted that, when combined with some corroborative evidence, "the jury, hearing [the defendant's] words and seeing his *demeanor*, was entitled to disbelieve [the defendant's] testimony and, in fact, to believe the opposite of what [the defendant] said." *Id.* at 314 (emphasis in original).[1]

### III.   ARGUMENT

#### A. The United States' Evidence at Trial Was More Than Sufficient to Prove the Defendant Guilty on All Counts.

To start, the United States' case-in-chief provided more than enough evidence for this Court to find that the United States met all each element of this crime when "view[ing] the evidence in the light most favorable to the government, with all reasonable inferences and

---

[1] Thus, the Eleventh Circuit held in *McCarrick* that a defendant testifying cannot be "the *sole* basis to support a conviction beyond a reasonable doubt" and that acquittal was proper because "the government ha[d] adduced no evidence" to support the conviction. 294 F.3d at 1293.

credibility choices made in the government's favor," as required under Rule 29 review. *Steiner*, 940 F.3d at 1288.  Based on the testimony that the witnesses testified to in trial, and as summarized above, testimonial and documentary evidence made it clear that the Defendant committed the crimes that were alleged in the Indictment.

For Count One, only the third element—that the Defendant's negligence caused M.C.G.F.'s death—was even really disputed, with the Defendant stipulating to his ownership and captaining of the Vessel and M.C.G.F.'s death established by a variety of witnesses, including the medical examiner. As far as the Defendant's negligence proximately causing M.C.G.F.'s death goes, witnesses for the government established this element could be met through three separate, but equally viable theories:

First, the Defendant's faulty Vessel modifications to the throttle controls and his failure to properly fix them when on notice was negligence that proximately caused M.C.G.F.'s death. The fact of the throttle modification itself was established through testimony from Inspector Fowler, who showed the picture of the modifications of the throttle, and through the Defendant himself, who acknowledged having modified the throttle controls. A slew of witnesses—from longtime divers like Ms. Hester and Mr. Flynn to USCG experts like LDCR Cole and Inspector Roth— testified that a captain and owner has a duty when an issue like this is known to be present to fix the issue. From there, Mr. Roth and Ms. Brammeier both explained that modifying throttle cables can impact how a vessel's engine is controlled, with potential malfunctions including that the engine would engage when it wasn't supposed to—precisely as happened here. Mr. Roth, Inspector Willems, and Dr. Tops also testified that the types of injuries could have only been caused by a propeller that was engaged.

Second, the Defendant violated a law or regulation when he failed to report the grounding to the USCG, and if the USCG had been aware of the grounding and associated issues that occurred on the previous day, they could have intervened and prevented the issue. This theory was established by testimony from Mr. Goodman and Mr. Mosquera, who testified that a grounding and loss of propulsion needed to be reported to the USCG and that the USCG takes remedial action in these cases that is tailored to the severity of the issue, with the issues present here being the type that would require intervention because of the danger that a malfunctioning propellers presents.

Third, the government provided evidence that the Defendant was on notice that the propeller was malfunctioning, and he failed to warn the passengers of the issue. As with the other violations here, a slew of witnesses—virtually every scuba passenger along with all the USCG experts—uniformly testified that a captain and owner of a vessel has a duty to warn passengers of known dangerous issues. Based on the grounding and the messages from Ms. Hester, the Defendant knew that the propeller was engaging while it was in neutral.  Instead of taking the proper steps to warn the passengers of the known issue, he proceeded as if nothing was wrong, which is what ultimately lead to the death of M.C.G.F.

As for the Defendant's false statement charged as Count Two, the United States provided ample evidence to prove that the Defendant lied on the USCG form he completed on March 5 as charged. That the Defendant claimed himself to be operating a recreational vessel was in no doubt: the form spoke for itself and had his signature (which he admitted to be his signature), and USCG employee Ms. Walker explained the form to the jury and what commercial "passenger" vessels are—which the Defendant, a licensed merchant mariner, would have known from the training required to become a licensed merchant mariner, as explained by the USCG employees who testified as well as Ms. Brammeier. The question them became whether the Defendant lied on the

14

form, and that was clear from the testimony of Mr. Poznak and Ms. Kelly, as well as the Defendant's many passengers, all of whom testified that the Defendant talked openly well before March 2020 about the Vessel's purpose: paid scuba chartering services, which is precisely what all the evidence shows the Defendant to have been doing on March 28 and 29.

Finally, as to the wire fraud charged as Counts Three through Five, there was more than enough evidence to convict the Defendant. In accordance with the jury instructions (DE 77), to convict the Defendant of the wire fraud charges, the United Stated needed to prove that: (1) the Defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises; (2) the false pretenses, representations, or promises were about a material fact; (3) the Defendant acted with the intent to defraud; and (4) the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

As far the first element is concerned, the United States has provided documentary evidence in the form of PPP loan applications and forgiveness applications, that the Defendant made false and fraudulent representations. (GX 87, 91, and 98).  All of these applications are signed by the Defendant, and the Defendant did not dispute that he was the one that filled them out.  The three wire fraud counts are specifically related to the PPP Loan application submitted on February 2, 2021, the PPP Loan forgiveness application submitted on May 4, 2021, and the PPP forgiveness application that was submitted on August 9, 2021. (GX 87, 91, and 98).  For the May 4, 2021, forgiveness application, Mr. Masterman from Celtic Bank testified that this was a document that his bank used to forgive the defendants PPP Loan.  For the February 2, 2020, application and August 9, 2021, forgiveness application, Mr. Pollack with Cross River Bank confirmed that these applications went to his bank.  Ms. Kelly also testified that the representations

related to the amount of money earned by Florida Scuba Charters and the number of employees of Florida Scuba Charters was false.

Captain Odom and Captain Brammier also confirmed that the Defendant never had any employees.  Both witnesses testified that the deckhands working on his boat were out there working for tips.  Based on the testimony from Ms. Harris about PPP loan rules, deckhands working for tips do not qualify as employes under the law. Special Agent King also testified that the funds from the PPP loans were used for other things besides payroll, as the Defendant affirmed on the application.  The Defendant also stipulated that the tax documents submitted with the PPP applications forgiveness applications were not actually filed with the IRS. Ms. Kelly also stated that the representations related to the finances and number of employees for Florida Scuba Charters were not accurate.  In sum, the Defendant provided false numbers of employees on the forgiveness applications, he represented that business was still operating, when it was not, and the amount of money he represented as payroll on the loan applications was false.  It is important to note that the amount of payroll that the Defendant listed on his applications continued to increase over time, even when his business was shut down by the Coast Guard. Even before the Captain of the Port Order shut formally shut down the Defendant's business, he told Mr. Goodman that his business was shut down.

The Tax documents presented by the Defendant, to the Celtic Bank and Cross River Bank were not only false in that they were never filed with the IRS, but they also contained fabricated payroll amounts. The bank statements for Florida Scuba Charters also revealed that the Defendant was using funds not for payroll, but for personal expenses, including for a golf membership. Lastly, Caleb King told you, and provided documents to prove that Florida Scuba charters was dissolved before the two forgiveness applications were even filed.

As to the second element, Justin Masterman and Avi Pollack both testified that their banks relied on the attestations made in these loans when making decisions on whether the loans are initially granted, and when they are later forgiven.

As for the third element, the Captain of the Port Order from the Coast Guard (GX 12) demonstrated that the Defendant's vessel was shut down, and that he could not operate, after April 9, 2020. This was corroborated by statements from Captain Cederholm and Mr. Mosquera, amongst others, that his business was shut down. The fact that the Defendant's business was shut down was also confirmed by everyone that interacted with the Defendant's business including Mr. Stieb and Mr. McKenna who worked at North Palm Beach Marina, where the Southern Comfort had been docked. Captain Brammier also reiterated that the Defendant's business was shut down, and she would have seen him out on the water, while running her charter.

Ms. Harris also testified that this program was intended for people that had payroll, and had their business shutdown because of the COVID-19 pandemic.  In the case of the Defendant here, he did not have payroll and his business was shut down by the Coast Guard, rather than by the pandemic.

As for the last element, Special Agent King testified, and showed the jury the bank statements showing that the funds were wired to the Florida Scuba Charters bank account.  Mr. Masterman and Mr. Pollack also both testified that their banks wired the money to the Defendant based on the false attestations in the applications.

### B.  The Defendant Choosing to Testify Dooms His Rule 29 Motion Anyway.

Yet even were the Government's case-in-chief not enough standing alone, the Court would have an additional basis for denying the Motion that weighs strongly against granting a Rule 29 motion: the Defendant's own testimony. As the Eleventh Circuit decided in *Brown*, "the

defendant's testimony, denying guilt, may establish, by itself, elements of the offense." 53 F.3d at 314-15. As was discussed in trial and as was outlined above, the Defendant here chose to take the stand and testify for more than six hours, telling lie after lie that the jury roundly rejected by convicting him on all counts. The fact that the Defendant chose to do this—and to testify about every single count—means that this Court should find the jury's disbelief reinforces that its verdict was informed by the evidence and was entirely reasonable.

### C. Ignoring the Foregoing Legal Standards, the Defendant's Motion Instead Raises Four Meritless Arguments that this Court Should Reject.

In the face of all this, the Motion raises four incorrect theories for why the Court should invalidate the jury's unanimous verdict and acquit him. To make these arguments, the Defendant has to make several factual and legal jumps that are not substantiated by the evidence provided or the law. A review of these mistaken approaches shows that none have a leg to stand on:

#### 1. Severing the Counts Has Nothing to Do With Evidentiary Sufficiency, the Court Ruled Correctly Anyway.

In his Motion, the Defendant first claims that the Court ruled incorrectly on the Defendant's earlier motion to sever. *See* Mot. at 2-8. On this front, the Government first incorporates by reference its fulsome briefing of this issue to this Court, DE 40; DE 49, that resulted in this Court denying the defense's motion, DE 52. On top of that, though, the Government here submits that its case-in-chief bore out precisely the connection between the manslaughter and the PPP fraud that it proffered to in its briefing. There was significant overlap between the witnesses that testified. In particular, Mr. Poznak and Ms. Brammeier both provided in-depth substantive evidence that was relevant to the seaman's manslaughter, and the wire fraud charges, as did Ms. Kelly, who testified about the Defendant refitting the Vessel himself during the purchase along with going over his PPP paperwork. Josh Steib also received emails from the Defendant, on April 3, 2020,

that related to both the Coast Guard report from the death of M.C.G.F., and the Defendant's initial PPP application. On top of that, several of the witnesses also testified that they never saw the Defendant operating the scuba charter after the death of M.C.G.F., which is relevant to the PPP fraud case because it tended to show that the Defendant's business was not operating like he claimed. This is important because the operating status of the Defendant's scuba charter business was critical to his PPP fraud. On balance, this is not the proper forum for relief, and the Court's initial decision not to sever the charges was further validated by the testimony at trial.

### 2. The Defendant's "Spoilage" Argument Has No Basis in Law or Fact.

The Motion next complains about so-called "spoilage of evidence" by claiming that the Vessel's unavailability tainted this case from the start. Mot. at 9-11. This argument fails for two reasons. *First*, the defense fails to provide a single case to support its proposition that the Vessel's unavailability warrants dismissal, and that's for good reason: there is none. To the contrary, the Eleventh Circuit's B4 pattern instruction bears out that the Government can prove its case by direct or circumstantial evidence, and the defense provides no basis for this Court to find that the Vessel was required. And indeed, here the defense's argument rings particularly hollow given that, as explained at trial, the only reason FWC or the USCG didn't take further action as to the Vessel on March 29 is that the Defendant hadn't disclosed the incidents that happened the day before like he was required to. *Second*, even if the defense had provided a case discussing the threshold of evidence required, the Government easily met its burden for the reasons described above. *See* Section III.A & B. Indeed, an ultimate determination of the mechanical cause for the propeller's activation was not necessary at trial because of the overwhelming evidence presented of the Defendant's many negligent acts that arose from the issues—his failing to notify, his failing to fix, and his failing to report, as explained above, and his lying about it on the witness stand.

### 3. Excluding the Victim's Toxicology was not Error and Would be Invited Error Even Had It Been.

The Defendant next tries to argue that the Court should have admitted the results victim's toxicology report, *see* Mot. at 11, but this argument again fails for two reasons. *First*, the defense stipulated to not seeking to admit the evidence at all, which makes its argument impermissible invited error under controlling Eleventh Circuit law. Specifically, the Defendant and the United States stipulated "that neither side will be introducing evidence pertaining to M.C.G.F.'s alleged ingestion of "edibles" prior to the alleged manslaughter or her toxicology," DE 60 at 2, and this is something the parties reaffirmed at trial. If the Defendant would have wanted to raise any argument related to this conduct or the toxicology report, they should have moved to admit it or at the very least litigated the question—but it chose not to. For the defense to now claim this to have been error is a classic example of invited error that this Court should reject. *See, e.g., United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) ("If a party agrees to the admissibility of certain evidence, he cannot later complain that any resulting error is reversible."); *United States v. Stone* 139 F.3d 822, 838 (11th Cir. 1998) ("The doctrine of invited error is implicated when a party induces or invites the district court into making an error."). *Second*, the defense fails to explain how this evidence could possibly have overcome the overwhelming evidence that the Government presented, much less the jury's soundly rejecting the Defendant's many lies. The Court should thus dispose of this argument just like it does the others.

### 4. The Evidence at Trial Was More Than Enough to Prove Wire Fraud.

The Defendant finally challenges the wire fraud convictions with two mistaken arguments. He first claims that the evidence failed to prove fraud, *see* Mot. at 11-12, but then confusing claims that the Internal Revenue Service did not lose money when it was the federal government writ large that paid out the PPP funds to the Defendant—a fact proven out by bank witnesses as well

as bank records that included not only PPP loan deposits but also checks that the Defendant signed himself drawing on those funds. The defense then claims that the tax forms were not truly attached to the PPP loans, *see* Mot. at 12-13, but here they are merely parroting the Defendant's lies on the stand without a shred of evidence to support it. To the contrary, the bank representatives explained that the tax documents in this case were precisely those submitted with the PPP loans that the Defendant submitted to them and are documents they relied upon in approving the submission. Which is all to say that here the Defendant relies on the same lies the jury rejected, and the Court should do the same in finding that the Government has met its burden on the wire fraud charges.

## IV.   CONCLUSION

For those reasons, this Court should deny the Motion without a hearing.

Date:   April 12, 2025.                    Respectfully submitted,

                                           HAYDEN P. O'BYRNE
                                           UNITED STATES ATTORNEY


                          By:      /s/ Tanner P. Stiehl
                                   TANNER P. STIEHL
                                   Special Assistant United States Attorney
                                   FL Bar No. 1031487
                                   99 Northeast 4th Street
                                   Miami, Florida 33132-2111
                                   786.360.9752
                                   Tanner.Stiehl@usdoj.gov


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 12, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                                   */s/ Tanner P. Stiehl*
                                   Tanner P. Stiehl
                                   Special Assistant United States Attorney

21